# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 14, 2009           Decided June 19, 2009

No. 08-1005

JOSEPH M. KEATING,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Joshua P. Thompson* argued the cause for petitioner. With him on the briefs were *James S. Burling* and *Damien M. Schiff.*

*Robert M. Kennedy Jr.*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Cynthia A. Marlette*, General Counsel, *Robert H. Solomon*, Solicitor, and *Holly E. Cafer*, Attorney.

Before: SENTELLE, *Chief Judge*, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: The Federal Energy Regulatory Commission granted Joseph Keating a license to build a hydroelectric power plant in 1992. At Keating's request, the Commission stayed the four-year statutory deadline for commencing construction on the project to allow Keating to obtain the necessary water rights. Over fifteen years after the license issued, the Commission lifted the stay and Keating's license expired. Keating now petitions for review of the Commission's decision to lift the stay, arguing that the record does not support the decision and that his reliance on the stay should estop the Commission from lifting it. We deny the petition because Keating was not entitled to an indefinite extension of the stay and the Commission's findings concerning the remaining hurdles to commencing construction were sufficient to support the denial of a further stay.

## I

In July 1992, the Commission issued Keating a license to develop his proposed "Tungstar Project," a hydroelectric power plant in the Inyo National Forest in California. *Joseph M. Keating*, Order Issuing License, 60 F.E.R.C. ¶ 61,016 (July 2, 1992). Under the proposed project, a dam would divert water flowing from Morgan Creek and a nearby tungsten mine's water treatment facility through a 3,500-foot-long penstock to one 990 kilowatt turbine generator. *Id.* at 61,061. After exiting the powerhouse tailrace, the water would "enter a 4,000-foot-long, man-made, meandering channel where suspended mine water flocculants w[ould] settle out" before the water would enter Pine Creek below its confluence with Morgan Creek. *Id.*

Under Section 4(e) of the Federal Power Act (FPA), 16 U.S.C. § 797(e), the United States Forest Service may impose conditions on the grant of a license on land within its jurisdiction. The Forest Service required Keating to obtain a

special use permit from the Service before starting construction, which he did in November 1995. That permit in turn required Keating to obtain the necessary water rights before beginning construction.

Section 13 of the FPA, 16 U.S.C. § 806, requires a licensee to commence construction of a newly licensed hydroelectric facility within two years of license issuance but allows the Commission to extend the deadline once for a maximum of two additional years. If the licensee does not commence construction within the statutory time frame, then "the license shall . . . be terminated" by the Commission after notice to the licensee. *Id.*; *see* 18 C.F.R. § 6.3 (requiring 90 days' notice to the licensee before termination). Nevertheless, the Commission has stayed the commencement-of-construction deadline beyond the statutory four-year period when a licensee was required to await "necessary actions of other federal or state agencies," such as approval of plans, before commencing construction. *Boise-Kuna Irrigation Dist.*, 111 F.E.R.C. ¶ 61,271, 62,216 (2005); *see, e.g.*, *R.L. Garry Corp.*, 51 F.E.R.C. ¶ 61,115, 61,310 (1990); *cf. Kings River Conservation Dist.*, 30 F.E.R.C. ¶ 61,151, 61,320 (1985) (describing the Commission's authority to issue stays as deriving from Section 309 of the FPA, 16 U.S.C. § 825h, and Section 705 of the Administrative Procedure Act, 5 U.S.C. § 705). The Commission stays the deadline only in these and similar "narrowly circumscribed circumstances"; it will not grant a stay "merely to relieve the licensee from the statutorily prescribed commencement of construction deadline." *Ronald E. Rulofson*, 62 F.E.R.C. ¶ 61,268, 62,780 (1993); *accord Elec. Plant Bd. of the City of Augusta, Ky.*, 112 F.E.R.C. ¶ 61,342, 62,504 (2005).

Keating requested, and the Commission granted, an extension of the commencement-of-construction deadline for two additional years as permitted under Section 13. *See Joseph*

*M. Keating*, Order Granting Stay Request in Part and Setting Deadline for Required Filings, 77 F.E.R.C. ¶ 61,060, 61,224 n.4 (October 21, 1996) (noting that the Commission granted the extension in an unreported order issued April 12, 1994). On his last day to commence construction under the four-year deadline, Keating asked the Commission to stay the deadline while he sought the necessary water rights. The Commission granted a stay of the commencement-of-construction deadline and ordered Keating to file annual reports on the status of his efforts to obtain water rights and satisfy the requirements of his Forest Service permit. *Id.* at 61,225-26. The Commission did not, however, stay the other requirements of Keating's license and advised Keating that within six months of the stay order he must file a license amendment application (necessitated by his proposed project redesigns) and eleven outstanding pre-construction plans, addressing topics such as erosion control and wildlife mitigation, some of which needed Forest Service approval in addition to Commission approval. *Id.*

Seeking the water rights necessary to develop his project and satisfy his Forest Service permit, Keating first argued to the Forest Service that he already had riparian rights to use the water. The Forest Service disagreed and directed Keating to pursue appropriative water rights from the state or a special use permit for use of federal riparian rights. *Id.* at 61,224 n.5. Keating instead litigated against the Forest Service from 1997 through 1999 in an attempt to confirm the adequacy of his riparian rights. Ultimately, the district court dismissed his suit, holding the Forest Service entitled to sovereign immunity, and the Ninth Circuit affirmed. *See Keating v. U.S. Dep't of Agric.*, 178 F.3d 1300, 1999 WL 311353 (9th Cir. 1999) (unpub.).

In 2001, Keating began seeking appropriative water rights by filing an application with the California State Water Resources Control Board (Water Board). His application

elicited protests from twelve entities; all but one—Pine Creek Mine—were eventually dismissed. Pine Creek Mine owned the mine that discharged some of the water Keating's Tungstar Project proposed to use and also held its own FERC permit for a proposed hydroelectric project. Of concern to the Water Board was the fact that Pine Creek Mine owned the property encompassing the proposed diversion point for Keating's project. In accordance with state regulations, the Water Board required Keating to demonstrate his ability to secure the necessary right of access over the land before it would approve his application. *See* Cal. Admin. Code tit. 23, § 775 ("When the owner will not consent, the board may require satisfactory evidence of the applicant's ability through condemnation proceedings or otherwise to secure the necessary right of access before the application will be approved."). Keating argued that, as a FERC licensee, the FPA gave him authority to condemn the land and claim the diversion point property. *See* 16 U.S.C. § 814. However, because Keating had not attempted to acquire the necessary property rights, the Water Board advised Keating that it would not move forward with his application until he provided information demonstrating that he had the ability to acquire the property and was actively pursuing obtaining it. Although Keating engaged in unsurprisingly unfruitful negotiations with Pine Creek Mine, he has not taken any steps to acquire access to the diversion point property through condemnation.

During this time, Keating sought numerous extensions of the six-month deadline for filing the required pre-construction plans and license amendment application, which extensions the Commission continued to grant from 1997 through 2003. In August 2003, the Commission sent Keating a letter reminding him of the most recent extended deadline for those requirements coming up in November 2003. The Commission directed Keating to respond and address why it should not lift the stay of

the construction deadline in light of the fact that the stay had been in effect for seven years, the fact that Keating had "ample opportunity . . . to secure the necessary property rights for th[is] project[] with no success," and his "repeated failure to provide timely status reports" as required by the stay order. Letter from Joseph D. Morgan, Director of Division of Hydropower, FERC, to Joseph M. Keating (August 26, 2003).

Keating missed the November 2003 deadline but requested a further extension in March 2004, which the Commission again granted. After corresponding with the Commission in April 2004, almost two years passed before Keating filed another status report, in February 2006. This report included some but not all of the required pre-construction plans. The report included correspondence showing the Forest Service approved the filed plans, but the Service later clarified that it believed its approval was not necessary because of Keating's "pending FERC license amendment." Keating, however, has not filed an amendment application with the Commission. When, in April 2007, the Commission inquired why Keating continued to resist filing the overdue amendment application to satisfy the Commission's requirement, he responded that his first priority was to obtain water rights.

The Commission lifted the stay of the commencement-of-construction deadline for the Tungstar Project by order of September 20, 2007 and announced that, because the stay was requested on the day of the deadline, the project license would terminate immediately after the mandatory 90 days' notice. *See Joseph M. Keating*, Order Lifting Stay of Construction Deadlines, Issuing Notice of Termination of License, and Dismissing Intervention, 120 F.E.R.C. ¶ 61,246 (September 20, 2007). The Commission explained that Keating's ability to commence construction still depended on approval of his six-year-old state water rights application, which in turn potentially

depended on Keating gaining access to the diversion site from the protesting party and obtaining a "point of discharge" permit; his yet-to-be-filed license amendment application; and Forest Service approval of certain pre-construction plans. *Id.* at ¶¶ 19-22. Because of these remaining hurdles, the Commission had "no reasonable assurance" that Keating would be able to commence construction "anytime in the foreseeable future." *Id.* at ¶ 22. Therefore, in light of Section 13's purpose to provide for prompt development of licensed projects, the Commission lifted the over eleven year stay, fifteen years after it issued the project license.

Keating sought rehearing of the order, arguing that he had been diligent in working to fulfill the requirements of the license. The Commission dismissed the request for rehearing as deficient because it did not include a "Statement of Issues" section separate from its arguments, as required by the Commission's Rules of Practice and Procedure. *See Joseph M. Keating*, Notice Dismissing Request for Rehearing, 121 F.E.R.C. ¶ 61,192 (November 19, 2007). In the dismissal order, however, the Commission went on to consider Keating's arguments and reject them as "without merit." *Id.* The Commission explained that, contrary to his argument in the rehearing request, Keating's diligence or lack thereof was not the deciding factor in the Commission's decision; rather, it was the "prolonged, continuing, and indefinite delay" in obtaining "water rights and other required pre-construction approvals." *Id.* (quoting Order Lifting Stay, 120 F.E.R.C. ¶ 61,246 at ¶ 1). Keating now petitions for judicial review of the order lifting the stay.

II

We must first address our jurisdiction to review this petition. The Commission urges that Keating did not satisfy the

jurisdictional prerequisites for judicial review because the Commission dismissed his rehearing request based on a regulatory deficiency instead of denying it on the merits, and he did not request rehearing of the dismissal order. *See* 16 U.S.C. § 825*l*(b). The Commission attempts to support its position with arguments focusing on the terminology of the rehearing order and characterizing its substantive content as unnecessary.

The reviewability of an administrative order, however, "must be evaluated in pragmatic terms," "by reference to its practical function." *Papago Tribal Util. Auth. v. FERC*, 628 F.2d 235, 239 (D.C. Cir. 1980) (quotation omitted). Section 313(b) of the FPA provides for judicial review of "orders of a definitive character dealing with the merits of a proceeding before the Commission . . . ." *Id.* (quoting *FPC v. Metro. Edison Co.*, 304 U.S. 375, 384 (1938)). That is what we have here. In the rehearing order, the Commission considered the merits of Keating's objections to the order lifting the stay, addressed those objections, and pronounced them "without merit." Notice Dismissing Request for Rehearing, 121 F.E.R.C. ¶ 61,192. Even if, as the Commission suggests, its discussion of the merits of Keating's objections was not the ultimate reason for dismissal of his rehearing request, that discussion and the consequent conclusion that the objections were "without merit" assures the "certainty of an adverse decision" should Keating undertake the "futil[e] [exercise] of seeking relief from the agency" again on the basis of those objections. *Tesoro Refining & Mktg. Co. v. FERC*, 552 F.3d 868, 873, 874 (D.C. Cir. 2009) (quotations and emphasis omitted). Keating sought agency rehearing based on objections to the aggrieving order, the Commission discussed and denied the merits of those objections, and Keating timely sought judicial review. We therefore have jurisdiction over his petition.

III

Turning to the merits of his petition, Keating argues that the record does not support the Commission's decision to lift the stay of the construction deadline and that his reliance on the stay should estop the Commission from lifting it. We will set aside the agency's order only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We may not disturb the Commission's decision under this deferential standard if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

A

Keating argues that the record does not support the Commission's conclusion that there is no reasonable basis to expect that he will be able to commence construction in the foreseeable future. The Commission reached this conclusion because his ability to commence construction still depended on (1) approval of his six-year-old state water rights application; (2) filing and approval of his license amendment application; and (3) filing and Forest Service approval of certain pre-construction plans. Order Lifting Stay, 120 F.E.R.C. ¶ 61,246 at ¶ 22. Even if, as Keating asserts without support, the license amendment and pre-construction plans would follow closely after he obtains water rights, the Commission emphasized record evidence demonstrating that, after six years before the Water Board, resolution of Keating's water rights application depended on "still-unresolved requirements of the Water Board that could require additional prolonged proceedings." *Id.* at ¶ 19. Namely, the Water Board had suggested that Keating might be required to obtain a "point of discharge" permit for his application and had instructed Keating that he must demonstrate he had the

ability to obtain, and was actively pursuing obtaining, the diversion point property before the Water Board would give him a hearing, which he had not taken steps to do. *See id.* at ¶¶ 19-20.

Keating cannot dispute the Commission's reasons for reaching its conclusion. He does not deny that he has not filed a license amendment application or the outstanding pre-construction plans, or that he has not obtained water rights or taken steps to acquire the diversion point property by condemnation. He takes issue primarily with the actions and decisions of the Water Board, in not yet clarifying whether a point discharge permit is necessary and in refusing to accept Keating's condemnation authority under the FPA as dispositive evidence of his ability and willingness to obtain the diversion point property through condemnation. The Water Board's actions and decisions, however, were matters of fact affecting Keating's ability to obtain the necessary water rights, and the Commission was entitled to consider them when assessing whether Keating could obtain water rights and satisfy the license requirements in the foreseeable future. We are not situated in this proceeding to rule on the Water Board's decisions. Because the Commission considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made, its conclusion was not arbitrary or capricious. *See Balt. Gas & Elec. Co.*, 462 U.S. at 105.

Moreover, assuming without deciding that the Commission may stay the statutory commencement-of-construction deadline, it was entirely within the agency's discretion to determine that a stay of over eleven years was long enough. "FERC has wide discretion to determine where to draw administrative lines," and "[w]e are generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to

the underlying regulatory problem." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002) (quotations omitted). In deciding to lift the stay, the Commission articulated rational reasons related to its statutory responsibility to provide for prompt development of licensed hydroelectric projects. *See* 16 U.S.C. § 806. Keating has not attempted to show that the Commission's line drawing in this case is inconsistent with its precedent. *See Elec. Plant Bd. of the City of Augusta, Ky.*, 112 F.E.R.C. ¶ 61,342, 61,504 ("After a licensee has held a license for [ten years] without making substantial progress toward project construction, the public interest requires that the license be terminated, thus freeing the site for development by other entities, or for other beneficial public uses."). Keating has not argued that the Commission treated him differently from others who were similarly situated. *See Burlington N. & Santa Fe Ry. Co. v. STB*, 403 F.3d 771, 776-77 (D.C. Cir. 2005). The Commission's decision therefore was not arbitrary or capricious, and we have no reason to second-guess the Commission's exercise of its line-drawing discretion.

B

Although the Commission has discretion to lift stays of construction deadlines and it gave rational reasons for doing so here, Keating argues that the Commission should nevertheless be estopped from lifting the stay. Even assuming principles of equitable estoppel may be applied against the federal government in these circumstances, *see Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 423 (1990), Keating's argument fails.

A party attempting to apply equitable estoppel against the government must show that "(1) there was a definite representation to the party claiming estoppel, (2) the party relied on its adversary's conduct in such a manner as to change his

position for the worse, (3) the party's reliance was reasonable[,] and (4) the government engaged in affirmative misconduct." *Morris Commc'ns, Inc. v. FCC*, ___ F.3d ___, 2009 WL 1288780, at \*6 (D.C. Cir. May 12, 2009) (quotations omitted). Keating has not shown that the Commission made a "definite representation" to him that the stay of the construction deadline would extend indefinitely until he obtained the necessary water rights. The stay order stated only that the construction deadline was stayed "pending further order of the Commission" and instructed Keating to file annual reports "on the status of efforts to obtain a Forest Service determination" that he had satisfied the Service's permit requirements. Order Granting Stay Request in Part, 77 F.E.R.C. ¶ 61,060, 61,225-26. The order also made clear that the deadlines for the license amendment application and pre-construction plans were still in effect. *Id.* Nowhere did the Commission represent to Keating that it would stay the statutory construction deadline for as long as he might want or need in order to obtain the water rights necessary to undertake his hydroelectric project. *Cf. Sierra Hydro, Inc.*, 116 F.E.R.C. ¶ 61,060, ¶ 7 (2006) ("While we are willing to make reasonable accommodations to afford licensees the time need[ed] to resolve issues with other agencies, we will not hold licenses in abeyance indefinitely."). Keating therefore cannot now estop the Commission from lifting the stay on that basis.[1]

---

[1] As Keating's claim to estoppel fails at this first step, we need not consider the remaining estoppel elements; our silence does not imply that he would be any more successful on those elements.

13

IV

For the foregoing reasons, we deny Keating's petition for review. We have no difficulty concluding that the Commission acted within its discretion in denying a further stay in light of its findings concerning the pre-construction elements still lacking after an over eleven year stay of the commencement-of-construction deadline.

*So ordered.*